**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

AMAZON.COM, INC., a Delaware
Corporation,

               Plaintiff,

     vs.                        Case No. _____

KENNETH L. JONES III, an individual;
and PHATLOGIC, LLC, a Georgia
limited liability company,

               Defendants.

## COMPLAINT

## I.    INTRODUCTION

1.    Amazon.com, Inc. is one of the most well-known and trusted brands in the world.  Defendants Kenneth L. Jones III and his company Phatlogic, LLC ("Phatlogic") operate an online advertising scheme that uses phony Amazon-branded "survey" websites in order to generate fraudulent traffic to sell to online advertisers.  Defendants' purported surveys—which do not collect responses—infringe Amazon's trademarks and make false claims about Defendants' association with Amazon.  This scheme harms Amazon, the advertisers who purchase Defendants' fraudulently generated traffic, and the numerous victims who visit Defendants' websites.

2.      The advertising scheme starts with messages sent to victims by affiliate marketers, which are companies and individuals hired to generate traffic for Defendants' survey websites.  The affiliate marketers' messages entice victims to click on a link that directs them to Defendants' survey page.  Among other tactics, the messages often contain Amazon's trademarks along with statements designed to deceive victims into believing the messages were sent by Amazon.

3.      When a victim clicks on the link in one of these messages, they are redirected through an affiliate marketing network to Defendants' survey website. Defendants pay the affiliate network for this traffic.  Defendants' survey greets victims as "Amazon Shopper" and uses Amazon's trademarks to deceive victims as to the survey's origin.  One example survey question is below:



4.    On the survey page, Defendants falsely claim that the victim was "chosen to participate in a short, anonymous survey regarding your experiences with **Amazon**" (emphasis in original).  However, Defendants' survey does not collect answers from victims; it is not a survey at all.  Its sole purpose is to generate victims to sell to online advertisers.

5.    After answering questions related to Amazon and its business, Defendants refer victims to other websites to claim a "reward" or "offer" they promised victims for completing the survey.  However, there is no "reward" or "offer."  Instead, Defendants sell the traffic to affiliate networks, which direct victims to an advertiser's website where victims can purchase a product that has no affiliation with Amazon.

6.    Amazon previously contacted Defendants regarding this unlawful advertising scheme and requested they stop their activities.  Defendants never responded and have continued running their phony Amazon-branded surveys.

7.    Amazon brings this lawsuit to stop Defendants' unlawful scheme and hold them accountable for the harm they continue to cause.

## II.   PARTIES

8.    Amazon is a Delaware corporation with its principal place of business in Seattle, Washington.  Through its subsidiaries, Amazon owns and operates the Amazon.com website and equivalent international websites.

9.    Jones is an individual who resides in Atlanta, Georgia and owns Phatlogic, LLC.  Jones owned, operated, and financially benefitted from the unlawful scheme that abused Amazon's brand and harmed Amazon's customers. Jones is directly liable to Amazon for the damages alleged in this Complaint. Alternatively, Jones had the right and ability to supervise, direct, and control the wrongful conduct alleged in this Complaint, and derived a direct financial benefit from that wrongful conduct.  As such, Jones is subject to liability for the wrongful conduct alleged herein under principles of secondary liability, including, without limitation, respondeat superior, vicarious liability, and/or contributory infringement.

10.    Phatlogic is a Georgia limited liability company and, on information and belief, has its principal place of business in Atlanta, Georgia.  Phatlogic is owned by Jones.  Phatlogic is directly liable to Amazon for the damages alleged in this Complaint, or alternatively, is secondarily liable to Amazon for these damages under principles of secondary liability, including, without limitation, respondeat superior, vicarious liability, and/or contributory liability.

### III.   JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over Amazon's claims for trademark infringement (15 U.S.C. § 1114), violations of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and trademark dilution (15 U.S.C. § 1125(c)) pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a).

12.    The Court has general personal jurisdiction over Defendants because, on information and belief, they are residents in this District.  Alternatively, the Court has specific personal jurisdiction of Defendants because they transacted business and committed tortious acts within this District, and Amazon's claims arise from those activities.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, on information and belief, Defendants are residents of the Northern District of Georgia and a substantial part of the events giving rise to the claims occurred in this district.

### IV.   FACTS

#### A.    Amazon is a Trusted Brand

14.    Amazon is a highly-trusted brand, recognized by millions of consumers throughout the world who use Amazon's online stores to conveniently purchase a wide array of products and services.

15.    In connection with its online stores, Amazon offers gift cards, promotions, and a variety of services.  One of Amazon's most popular offerings is Prime, which is a paid membership program that provides discounts on shipping and free access to digital content (to name just two of Prime's features).

16.    Amazon sends customers messages via SMS and email in connection with its products and services.  As a result, Amazon's customers have come to expect to receive these types of communications from Amazon, to use Amazon's services online, and to interact with Amazon online.

17.    Amazon's products and services are readily identifiable to consumers around the world because of the company's substantial and years-long investment of time, money, and other resources in Amazon's brand, including the development of valuable intellectual property.

18.    Amazon exclusively owns numerous U.S. trademark registrations and pending applications.  These trademarks are a critical component of a consumer's ability to readily identify Amazon products and services.

19.    As alleged in this Complaint, the following trademarks and service marks (collectively "Amazon Trademarks") were unlawfully used to further Defendants' scheme:

| Mark | Registration No. (International Classes) |
|---|---|
| AMAZON | 2,657,226 (Int. Cl. 42)<br>2,738,837 (Int. Cl. 38)<br>2,738,838 (Int. Cl. 39)<br>2,832,943 (Int. Cl. 35)<br>2,857,590 (Int. Cl. 9)<br>3,868,195 (Int. Cl. 45)<br>4,171,964 (Int. Cl. 9)<br>4,533,716 (Int. Cl. 2)<br>4,656,529 (Int. Cl. 18)<br>4,907,371 (Int. Cls. 35, 41, 42)<br>5,102,687 (Int. Cl. 18)<br>5,281,455 (Int. Cl. 36) |
| amazon | 4,171,965 (Int. Cl. 9)<br>5,038,752 (Int. Cl. 25) |
| PRIME | 5,218,535 (Int. Cl. 35)<br>5,489,315 (Int. Cl. 42)<br>5,218,536 (Int. Cl. 41) |

20.    The Amazon Trademarks have been used exclusively and continuously by Amazon, and have never been abandoned.  The above U.S. registrations for the Amazon Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  The registrations for the Amazon Trademarks constitute prima facie evidence of their validity and of Amazon's exclusive right to use the Amazon Trademarks pursuant to 15 U.S.C. § 1057(b).

**B.    Affiliate Marketing Abuse**

21.    A successful website requires internet "traffic," which is a term used to describe online visits to the website.  Website traffic is akin to customers shopping at physical retail stores.  Just as brick-and-mortar stores need foot traffic to generate sales, and similarly, websites need traffic in order to monetize the website through sales and advertising revenues.

22.    Affiliate marketing arose from the need to source relevant traffic for websites.  Broadly speaking, an affiliate publishes material to generate traffic on behalf of an advertiser (i.e., the party who wants the traffic for their website).

23.    An affiliate can source traffic through a variety of means, including, relevant to this case, SMS (text) messages, emails, and websites that prompt users to click through, such as online surveys.

24.    The demand for traffic has spurred the growth of businesses that help connect affiliates and advertisers.  One example of this is an affiliate network, which generally acts as an intermediary between the advertiser and the affiliates.  In this model, an advertiser approaches a single network, who then contracts with one or more affiliates to provide traffic for the advertiser.

25.    Affiliates use domains designed to redirect online consumers to another domain.  These redirect domains do not render content (such as a webpage of their

own) and instead are generally invisible to consumers. When people click on links in an affiliate's email or webpage, they see only the final landing page, even though they may have passed through multiple redirect domains along the way.

26.    In one common form of affiliate abuse, affiliates generate traffic by impersonating well-known brands such as Amazon. Affiliates exploit the brand's recognition with customers to entice people to click through to a third-party advertiser's website, often based on false promises of a reward or gift. The affiliate is then paid for this fraudulent traffic.

27.    The generation of traffic through the misuse of a brand's intellectual property harms the people who are deceived by the affiliate's message or website, the brands whose intellectual property is damaged by these fraudulent campaigns, and the end advertiser who ultimately pays for the traffic.

### C.    Defendants' Unlawful Affiliate Marketing Scheme

28.    Defendants are engaged in a widespread, fraudulent marketing scheme that abuses Amazon's brand to generate traffic. Defendants profit from the scheme by selling this fraudulently generated traffic to affiliate marketing networks, which in turn sell the traffic to advertisers.

29.    As explained below, Defendants' scheme involves four main stages. First, consumers receive emails and text messages sent by affiliate marketers that

use Amazon's brand and entice them to click a link in the messages.  Second, the affiliate marketers redirect traffic from these messages to affiliate networks, which in turn direct those consumers to Defendants' phony "survey" website.  Third, Defendants use the Amazon Trademarks and false statements to deceive their victims into clicking through their purported survey.  Fourth, Defendants sell traffic from their survey to other affiliate networks, which in turn direct victims to websites controlled by advertisers—which is how Defendants monetize the scheme.

### 1. Affiliate Marketers Send Victims Unauthorized Emails and SMS Messages Using Amazon's Trademarks

30.     To source traffic, affiliate marketers send unauthorized emails and text messages that display Amazon's trademarks and make false statements to deceive victims into believing the messages are affiliated with Amazon.  The purpose of the messages is to entice victims to click on a link in the message.

### (a) Emails

31.     On information and belief, multiple affiliate marketers sent emails to victims as part of Defendants' scheme.

32.     One of these emailers was an affiliate marketer named Ryan Becker.  A partial screenshot of one of Becker's emails is below (with information redacted to protect the recipient's identity):



33.    A partial screenshot of another email sent as part of Defendants'

scheme is below (with information redacted to protect the recipients' identities):



34.     Each of the emails above directed traffic to affiliate networks, which in turn, directed traffic to Defendants' websites.

35.     The affiliate marketers' emails are intentionally designed to appear as though they originate with Amazon.

36.     This deception starts with the "From" address displayed to the recipient. The Amazon Trademarks appear in the email address displayed to victims, which in

the above examples were "Prime Member" (primemember@) and "Amazon Survey" (amazon.survey@).

37.     The subject lines of the emails are also designed to deceive victims into believing the messages originate with Amazon.  The subject line from one of the above examples was "Amazon has a surprise for you!"  Another email contained the misleading subject "Congrats on your Amazon Loyalty Voucher!"

38.     The bodies of the emails continue to use the Amazon Trademarks and other misleading statements and images.  For example, the emails sent by Becker start by displaying a counterfeit Amazon trademark.  Below the Amazon mark, the email thank the victim for their "recent Purchase on Amazon."  The email then invites the victim to review their purchase and claims that the victim's feedback would help "customers pick the right products on Amazon."  The body of the email concludes with the line "Thank you for shopping with Amazon, we appreciate your feedback."  Becker's emails even contained an alleged Amazon reference number, titled "--AmazonReward--", but that reference number was not genuine.

39.     To further entice victims to click the links in these emails, the emails often state that the victim is "just one click away to activate your $50 voucher," or that victims who "Take Our Survey" will "Win A Giftcard."  The affiliate marketers

do not offer any victim a "voucher" or gift card, and they are not "one click away" from a reward.

40.    These Amazon-branded emails were not approved by or affiliated with Amazon.

## (b)    Text messages

41.    In addition to emails, affiliate marketers also sent text messages to generate traffic for this scheme.

42.    A partial screenshot of one of these text messages is below (with identifying information redacted):



43.    Like the emails, these text messages are intentionally designed to mislead victims into believing they originate with Amazon.

44.    The text message—sent in early January—begins with "Amazon" and purports to describe Amazon's 2020 "resolutions."  The message then offers victims

"$130 freebies for a survey" and provides a link.  The affiliate marketer does not in fact provide any victim $130 or "freebies."

45.     The text messages are not affiliated with or approved by Amazon.

46.     These SMS messages have generated a number of online complaints and security alerts, which demonstrates the sheer number of messages sent, and the harm they caused.

### 2.     Affiliate Marketers Refer Victims to Affiliate Networks

47.     When a victim clicks the link contained in the affiliate marketer's message, the affiliate marketer redirects the victim to a domain controlled by an affiliate network.  The affiliate networks' domains do not render content in the victim's browser, but serve to redirect traffic.

48.     One of the affiliate networks that received traffic from the Amazon-branded messages is Addicted Affiliate, LLC.

49.     Other affiliate networks that received traffic from Amazon-branded messages used the redirect domains northou.com, trixonesis.com, and messageadvantage.com.

### 3.     Defendants Deceive Victims into Clicking Through a "Survey" By Using Amazon's Brand

50.     The affiliate networks receiving traffic from the Amazon-branded messages redirect victims to websites controlled by Defendants.

51.    One of the affiliate networks involved, Addicted Affiliate, identified Jones and his company Phatlogic as the person who received traffic from emails in this scheme.

52.    On information and belief, Defendants paid the affiliate networks for the referred victims pursuant to contracts between Defendants and the affiliate networks.

53.    Defendants use the domains ballerclick.com and, on information and belief, multiplyintegers.com, to receive traffic from affiliate networks.  Like the affiliate network domains, these domains do not render content in the victim's browser, but serve to redirect traffic and collect data.

54.    Defendants' domain ballerclick.com is hosted with Choopa LLC.  The name on the account is Kenneth Jones and the email is bandit09@gmail.com—an email address connected to Jones through multiple sources.  The address on the account is Jones's home address.  Communications produced by Choopa also show Jones actively managing this hosting account.

55.    After being referred through the affiliate networks' and Defendants' redirect domains, the victim arrives on Defendants' survey page that heavily uses Amazon's brand.  Defendants have created multiple versions of their survey page and used numerous domains to render their survey page, including

globalsurveyscenter.com (hosted by Jones's account at Choopa) and infinite-surveys.com.  True and correct screenshots of two versions of Defendants' survey page are attached to this Complaint as Exhibit 1 and Exhibit 2.

56.     Defendants use Amazon's brand on their websites to entice victims to click on through the survey—which is how Defendants earn money from this scheme.  Amazon's brand help legitimize Defendants' surveys and increases the likelihood that victims will click through.

57.     When a victim first arrives on Defendants' survey page, the victim sees a greeting that addresses the victim as "Amazon Shopper."  The message invites the victim to complete a survey "regarding your experience with Amazon" or "regarding your opinion of Amazon" in order to get "exclusive rewards" or "an exclusive offer."  Screenshots of two of Defendants' greeting messages are below:

*[Image on the following page]*





58.     After clicking "Start Survey," victims are presented with a survey page that contains a header using Amazon's name and the words "Shopper Survey." Amazon is often written in lowercase letters ("amazon") to mimic Amazon's

18

trademark.   Defendants also often intentionally mimic Amazon's designs and color schemes, including Amazon's navy blue banner heading and gold rectangular buttons to indicate options victims can select.

59.   Partial screenshots of two versions of Defendants' survey page are below:





60.     Defendants' survey page leads victims through a series of questions that further deceive victims into believing the survey originates with or is sponsored by Amazon.

61.     Defendants' survey asks questions about shopping on Amazon such as, "Are you an Amazon Prime Member?"; "Are the products you buy from Amazon usually in-stock at the time of purchase?"; "What type of device do you most often use to shop online?"; and "Have you seen any online advertisements for Amazon

within the past week?"  Defendants intentionally craft these questions to appear as though they are collecting information for Amazon.

62.    However, the survey is not affiliated with Amazon, the victims' responses are not provided to Amazon, and Defendants do not actually collect or use the responses.  Rather, the purpose of the survey is merely to cause victims to click through Defendants' website.

63.    Below Defendants' survey questions in at least one version of their survey is a message that states the website is "not affiliated with or endorsed by Amazon" and that Defendants do not have a right to use the trademarks.  This disclaimer is in substantially smaller font than is used on the rest of the website.

64.    The inclusion of this language demonstrates Defendants' knowledge of Amazon's exclusive right to use the Amazon Trademarks, and admits that Defendants lack any right or authority to use them.  This purported disclaimer also demonstrates that Defendants' design, display, and use of the Amazon Trademarks on their survey page is intentional and willful.

65.    Notwithstanding Defendants' ineffective disclaimer, the rest of the survey page is expressly designed and intended to give victims the false impression that it originates with, is affiliated with, or is sponsored by Amazon.  It is also

intentionally designed to deceive victims into believing that completing the survey will lead to a reward.

### 4. Defendants Send Victims Who Complete the "Survey" to Affiliate Networks and Advertisers

66. Upon completing the survey, victims are presented with a "Thank you" message for their "participation." Among other things, the message deceptively states, "While we submit your answers, we are searching our inventory to see which products we can offer you as a **thank you** for completing the survey" (emphasis in original). As explained above, however, Defendants do not "submit" or even record any victim's answers. Like the other aspects of Defendants' survey, this message is intentionally designed to deceive victims into believing their survey responses are providing feedback to Amazon.

67. Victims are then presented with a page where they supposedly claim their "Reward" for completing the survey. Oftentimes, at the top of the page in bold print, Defendants thanks victims for "completing the Amazon survey!"

68. The rewards page displays numerous products that are intentionally designed to appear as Amazon product listings. Defendants present these products

as free or heavily discounted "rewards."  Partial screenshots of two versions of this

page are below:





69.    None of the offers contained on Defendants' rewards page is endorsed by Amazon.

70.    Similar to what happens after a victim clicked the link in the emails or text messages, clicking one of Defendants' "rewards" sends the victim through a series of redirect domains.

71.    Victims are first redirected to the domain fuegoclick.com, which is controlled by Defendants.    On information and belief, Defendants use

fuegoclick.com to track the number of victims who click through their survey and to redirect victims to affiliate networks.

72.    From fuegoclick.com, victims are redirected to various domains controlled by affiliate networks.  Each affiliate network then redirects the victim to an advertiser where victims can "purchase" the product they selected on Defendants' "reward" page.

73.    On information and belief, these affiliate networks pay Defendants for the traffic they refer to them.  Four of the affiliate networks Defendants direct traffic to are Express Revenue, Inc., Clickbooth.com, LLC, Traverse Data, Inc., and BDEX, LLC.  Clickbooth.com, LLC identified Jones and his company Phatlogic as the person who sent traffic from the survey page in this scheme.

## V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Trademark Infringement (15 U.S.C. § 1114)

74.    Amazon incorporates by reference the factual allegations contained in Sections I–IV as though set forth herein.

75.    Defendants' activities infringe the Amazon Trademarks.

76.    Amazon advertises, markets, and distributes its products and services using the Amazon Trademarks, and it uses these trademarks to distinguish its

products and services from the products and services of others in the same or related fields.

77.    Because of Amazon's long, continuous, and exclusive use of the Amazon Trademarks, they have come to mean, and are understood by customers, users, and the public to signify, products and services from Amazon.

78.    Defendants use the Amazon Trademarks in commerce in a manner that is likely to cause confusion, mistake, or deception as to the source, origin, or authenticity of their website.

79.    Further, Defendants' activities are likely to lead the public to conclude, incorrectly, that Defendants' website originates with or is authorized by Amazon, thereby harming Amazon and the public.

80.    At a minimum, Defendants acted with willful blindness to, or in reckless disregard of, their authority to use the Amazon Trademarks and the confusion that the use of those trademarks would have on consumers as to the source, sponsorship, affiliation or approval by Amazon of Defendants' website.

81.    Defendants are subject to liability for the wrongful conduct alleged herein, both directly and under various principles of secondary liability, including without limitation, respondeat superior, vicarious liability, and/or contributory infringement.

82.     As a result of Defendants' wrongful conduct, Amazon is entitled to recover its actual damages, Defendants' profits attributable to the infringement, and treble damages and attorney fees pursuant to 15 U.S.C. § 1117(a)–(b).  The amount of money due from Defendants to Amazon is unknown to Amazon and cannot be ascertained without a detailed accounting by Defendants.  Alternatively, Amazon is entitled to statutory damages under 15 U.S.C. § 1117(c).

83.     Amazon is further entitled to injunctive relief, as set forth in the Prayer for Relief below.  Amazon has no adequate remedy at law for Defendants' wrongful conduct because, among other things: (a) the Amazon Trademarks are unique and valuable property; (b) Defendants' infringement constitutes harm to Amazon's reputation and goodwill such that Amazon could not be made whole by any monetary award; (c) if Defendants' wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin or authenticity of the infringing websites; and (d) Defendants' wrongful conduct, and the resulting harm to Amazon, is continuing.

## SECOND CAUSE OF ACTION

**False Designation of Origin, Sponsorship, Approval, or Association and False Advertising (15 U.S.C. § 1125(a))**

84.     Amazon incorporates by reference the factual allegations contained in Sections I–IV as though set forth herein.

85.     Amazon advertises, markets, and distributes its products and services using the Amazon Trademarks, and it uses these trademarks to distinguish its products and services from the products and services of others in the same or related fields.

86.     Because of Amazon's long, continuous, and exclusive use of the Amazon Trademarks, they have come to mean, and are understood by customers, end users, and the public to signify, products and services from Amazon.

87.     Amazon has also designed distinctive displays, logos, icons, and graphic images (collectively, "Amazon designs") for its websites.

88.     Defendants' wrongful conduct includes the use of the Amazon Trademarks, imitation designs (specifically displays, logos, icons, and/or graphic designs virtually indistinguishable from the Amazon designs), and false or misleading description or representation of fact in connection with Defendants' commercial marketing activities.

89.    Defendants' activities deceive consumers.  On information and belief, Defendants' wrongful conduct misleads and confuses users and the public as to the origin and authenticity of the goods and services advertised, marketed, offered or distributed in connection with Amazon's trademarks, name, and imitation visual designs, and wrongfully trades upon Amazon's goodwill and business reputation.

90.    Defendants' acts constitute willful false statements in connection with goods and/or services distributed in interstate commerce, in violation of 15 U.S.C. § 1125(a).

91.    Defendants are subject to liability for the wrongful conduct alleged herein, both directly and under various principles of secondary liability, including without limitation, respondeat superior, vicarious liability, and/or contributory infringement.

92.    Amazon is further entitled to injunctive relief, as set forth in the Prayer for Relief below.  Defendants' acts have caused irreparable injury to Amazon.  The injury to Amazon is and continues to be ongoing and irreparable.  An award of monetary damages cannot fully compensate Amazon for its injuries, and Amazon lacks an adequate remedy at law.

93.    As a result of Defendants' wrongful conduct, Amazon is entitled to recover its actual damages, Defendants' profits, and treble damages and attorney

fees pursuant to 15 U.S.C. § 1117(a)–(b).   The amount of money due from Defendants to Amazon is unknown to Amazon and cannot be ascertained without a detailed accounting by Defendants.

## THIRD CAUSE OF ACTION

### Trademark Dilution (15 U.S.C. § 1125(c))

94.    Amazon incorporates by reference the factual allegations contained in Sections I–IV as though set forth herein.

95.    Amazon has exclusively and continuously promoted and used the Amazon Trademarks.   As one of the world's most well-known technology companies, the Amazon Trademarks have become famous, distinctive and well-known symbols of Amazon—well before the Defendants began using the Amazon Trademarks in association with their goods or services unaffiliated with Amazon through the Defendants' illegal use and infringement of the Amazon Trademarks.

96.    The actions of the Defendants including, but not limited to, their unauthorized use of the Amazon Trademarks in commerce to deceive users into believing Defendants' websites are affiliated with Amazon are likely to cause dilution of the Amazon Trademarks by blurring and tarnishment in violation of 15 U.S.C. § 1125(c).

97.     As a result of Defendants' willful conduct, Amazon is entitled to recover its actual damages, Defendants' profits, and treble damages and attorney fees pursuant to 15 U.S.C. § 1117(a).

98.     Amazon is further entitled to injunctive relief, as set forth in the Prayer for Relief below.  Defendants' acts have caused irreparable injury to Amazon.  The injury to Amazon is and continues to be ongoing and irreparable.  An award of monetary damages cannot fully compensate Amazon for its injuries, and Amazon lacks an adequate remedy at law.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Amazon respectfully prays for the following relief:

A.     That the Court enter judgment in Amazon's favor on all claims;

B.     That the Court issue an order permanently enjoining Defendants, their officers, agents, representatives, employees, successors and assigns, and all others in active concert or participation with them, from:

(i)     Using the Amazon Trademarks in connection with any offer, survey, commercial email, marketing campaign, or website;

(ii)    Using any other indication of Amazon's brand in connection with any offer, survey, commercial email, marketing campaign, or website;

(iii)   Making any statement of an affiliation or connection to Amazon in connection with any offer, survey, commercial email, marketing campaign, or website; or

(iv)   Assisting, aiding or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (i) through (iii) above;

C.     That the Court enter an order requiring Defendants to provide Amazon a full and complete accounting of all gross and net amounts earned in connection with the scheme alleged in this Complaint;

D.     That Defendants' profits from the unlawful scheme alleged in this Complaint be disgorged pursuant to 15 U.S.C. § 1117(a);

E.     That Defendants be required to pay all general, special, actual, and statutory damages which Amazon has sustained, or will sustain, as a consequence of Defendants' unlawful acts, and that such damages be enhanced, doubled, or trebled as provided for by 15 U.S.C. § 1117(a)–(b), or otherwise allowed by law;

F.     That Defendants be required to pay the costs of this action and Amazon's reasonable attorneys' fees incurred in prosecuting this action, as provided for by 15 U.S.C. § 1117 or otherwise by law; and

That the Court grant Amazon such other, further, and additional relief as the Court deems just and equitable.

DATED: June 1, 2020

**HOLLAND & KNIGHT LLP**

*/s/ Caroline Johnson Tanner*
Caroline Johnson Tanner
Georgia Bar No. 392580
One Regions Plaza, Suite 1800
1180 West Peachtree Street, N.W.
Atlanta, GA 30309-3407
(404) 817-8500
(404) 881-0470 (Fax)
caroline.tanner@hklaw.com

**DAVIS WRIGHT TREMAINE LLP**

Bonnie E. MacNaughton
(*pro hac vice forthcoming*)
Sara A. Fairchild
(*pro hac vice forthcoming*)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
(206) 757-7700 (Fax)
bonniemacnaughton@dwt.com
sarafairchild@dwt.com

Meagan Himes
(*pro hac vice forthcoming*)
1300 SW Fifth Avenue, Suite 2400
Portland, OR 97201
(503) 241-2300
(503) 778-5299 (Fax)
meaganhimes@dwt.com

*Attorneys for Plaintiff Amazon.com, Inc.*

33